KOY v. SCHNEIDER, Tax Collector.*
(No. 3359.)

(Supreme Court of Texas.   Jan. 28, 1920.)

1. CONSTITUTIONAL LAW ⚖══13—INTENTION OF FRAMERS TO BE CONSIDERED IN INTERPRETATION.

In ascertaining whether a certain interpretation should be given a constitutional provision, it is proper to consider whether its framers and the voters adopting it intended the consequences which must follow a given construction.

2. CONSTITUTIONAL LAW ⚖══48 — STATUTE WILL BE SUSTAINED IN CASE OF DOUBT.

A statute will not be declared unconstitutional in a doubtful case.

3. ELECTIONS ⚖══9—STATUTE PROVIDING THAT WOMEN MAY VOTE AT PRIMARY "ELECTIONS" VALID.

Acts 4th Called Sess. 35th Leg. (1918) c. 34, empowering women to vote at primary elections, does not violate Const. art. 6, § 2, making only male persons qualified electors at elections within the state, since the word "elections" in the Constitution refers only to governmental elections and not to preliminary and non-governmental activities like primary elections.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Election.]

Phillips, C. J., dissenting.

Certified Question from Court of Civil Appeals of First Supreme Judicial District.

Mandamus proceedings by Mrs. Alma Koy against William Schneider, Tax Collector. From an order sustaining a general demurrer to the petition, the petitioner appealed to the Court of Civil Appeals of the First Supreme Judicial District, which certified a question to the Supreme Court.   Question answered in the negative.

Walker Acker, of Houston, for relator.
C. G. Krueger, of Bellville, and McMeans, Garrison & Pollard, of Houston, for respondent.
W. J. Townsend, Asst. Atty. Gen., amicus curiæ.

GREENWOOD, J.   Question certified from the Court of Civil Appeals of the First Supreme Judicial District of Texas, in an appeal from the district court of Fayette county.

The certificate of the honorable Court of Civil Appeals is as follows:

"In the above styled and numbered cause, now pending in this court on appeal from the district court of Fayette county, the question hereinafter stated which is material to a decision of this appeal arises upon the statement of the nature and result of the suit, and the facts disclosed by the record, which are as follows:

"The suit was brought by appellant for mandamus to compel the appellee, the tax collector of Austin county, to issue a poll tax receipt entitling her to vote, under the provisions of chapter 34, Acts of the Fourth Called Session of the Thirty-Fifth Legislature. The petition alleges, and the facts disclose, that appellant possessed all of the qualifications of a voter prescribed in said act of the Legislature. The application for payment of poll tax and the issuance of receipt therefor contains all of the requisites prescribed by the statute. The appellee, upon presentation of the application, refused to accept the poll tax money which was tendered by appellant, and refused to issue her a receipt.

"The appellee answered in this suit by filing a general demurrer, and admitting the allegations of plaintiff's petition as to her sex, residence, tender of poll tax money, demand for poll tax receipt, and all other facts necessary to entitle her to a poll tax receipt under said act of the Legislature. The court below sustained appellee's general demurrer to plaintiff's petition, on the ground that the act of the Fourth Called Session of the Thirty-Fifth Legislature, before cited, was unconstitutional and void.

"Because of the public importance of the question, and the obvious desirability of obtaining its final decision within the earliest practicable time, we deem it advisable to certify for your decision the following question:

"Is the act of the Legislature above cited, granting to women the privilege of voting in primary elections, violative of section 2 of article 6 of our state Constitution?"

Article 6 of the Constitution of the state of Texas, in section 2, prescribes that every male person, subject to no disqualification specified by section 1, and who shall have attained the age of 21 years, and who shall be a citizen of the United States, and who shall have resided in this state one year next preceding an election and the last six months within the district or county in which he offers to vote, shall be deemed a qualified elector; and that every male person of foreign birth, subject to no disqualification specified by section 1, who not less than six months before an election at which he offers to vote shall have declared his intention to become a citizen of the United States in accordance with the federal naturalization laws, and shall have resided in this state one year next preceding such election and the last six months in the county in which he offers to vote, shall also be deemed a qualified elector.

The act of the Legislature confers the right to vote on women possessing the qualifications, save of sex, of electors under the Constitution and laws of the state, at any and all primary elections or nominating conventions to be held under the laws of the state, and requires each woman offering to vote in any primary election or convention, after January 1, 1919, to comply with all provisions of

our laws requiring and permitting voting on payment of poll taxes.

Our answer to the certified question depends on whether the constitutional provision, when rightly construed, fixes the qualifications of participants in party primaries or conventions.

There are many organized voluntary groups in the various states of the Union, whose purposes and objects depend for their accomplishment on the exercise of a form of suffrage by the individual member. Such groups are of the highest value in the promotion of the general good. Among these groups are many maintained for charity, many maintained for helpful co-operation, such as mutual insurance associations, and many maintained for the support of religious worship, such as the various churches having a congregational form of government. The law recognizes, and will often enforce, the right of the individual as an elector in the conduct of the affairs of each of such groups to which he belongs, but no one would maintain that such right, even when exercised in a group regulated by statute, as not infrequently occurs, came within the purview of article 6 of our Constitution. It follows that the words "qualified elector" and the word "election" were not used in this constitutional provision in the broadest possible sense, and that in order to determine their application to the exercise of the right of suffrage within an organization we cannot ignore the essential nature and objects of such organization.

The act of the Legislature deals only with suffrage within the party primary or convention, which is but an instrumentality of a group of individuals for the accomplishment of party ends.

As so well stated by this court in Waples v. Marrast, 108 Tex. 11–13, 184 S. W. 183, 184 (L. R. A. 1917A, 253):

"A political party is nothing more or less than a body of men associated for the purpose of furnishing and maintaining the prevalence of certain political principles or beliefs in the public policies of the government. As rivals for popular favor they strive at the general elections for the control of the agencies of the government as the means of providing a course for the government in accord with their political principles and the administration of those agencies by their own adherents. According to the soundness of their principles and the wisdom of their policies, they serve a great purpose in the life of a government. But the fact remains that the objects of political organizations are intimate to those who compose them. They do not concern the general public. They directly interest, both in their conduct and in their success, only so much of the public as are comprised in their membership, and then only as members of the particular organization. They perform no governmental function. They constitute no governmental agency. The purpose of their primary elections is merely to enable them to furnish their nominees as candidates for the popular suffrage. * * * To provide nominees of political parties for the people to vote upon in the general elections is not the business of the state. It is not the business of the state because in the conduct of the government the state knows no parties and can know none. * * * Political parties are political instrumentalities. They are in no sense governmental instrumentalities."

In a previous portion of the opinion, the court recognized that—

"General elections are essential to the public welfare and are distinctly related to the discharge of an important governmental duty, because it is only by their means that the organic law may be amended and in the elective offices public officials be supplied for the various administrative, agencies of the state." 108 Tex. 11, 184 S. W. 183, L. R. A. 1917A, 253.

From the above it appears that the real question before us is whether we should construe the suffrage article of our Constitution as sufficiently broad in scope to relate to suffrage within a mere political organization, as contradistinguished from a governmental organization, and within an organization, whose objects do not concern the general public and are intimate only to those who are comprised within the organization's membership. To our minds, this question admits of no answer save in the negative.

It is difficult to conceive how the primary election law of this state, even without the provision admitting women to participation in primaries and conventions, could be held free of violation of the Constitution, if section 2 of article 6 were construed to govern voting at party primaries and conventions. For it would seem unquestionable that the constitutional provision was designed to prevent the denial of the right of suffrage, which it safeguards, to any person possessing the requisite qualifications; and all the authorities seem in accord with the statement that—

"Where the right of suffrage is fixed in the Constitution of a state, as is the case in most states, it can be restricted or changed by an amendment to the Constitution or by an amendment to the federal Constitution, which, of course, is binding upon the states. But it cannot be restricted or changed in any other way. The Legislature can pass no law, directly or indirectly, either restricting or extending the right of suffrage as fixed by the Constitution." 10 A. & E. Encyclopedia of Law, 573, 576; 15 Cyc. 282; 8 R. C. L. § 41.

In Cooley's Constitutional Limitations, in section 599, it is said:

"Whenever the Constitution has prescribed the qualifications of electors, they cannot be changed or added to by the Legislature or otherwise than by an amendment to the Constitution."

The rule stated was approved in the opinion of Justice Ramsey in Solon v. State, 54

(218 S.W.)

Tex. Cr. R. 261, 114 S. W. 349, where it is said:

"Where a Constitution has conferred the right and prescribed the qualifications of electors, it of course is paramount until amended, and the Legislature cannot change or add to them in any way; but, where the Constitution does not fix the right of suffrage or prescribe the qualifications of voters, it is competent for the Legislature, as the representative of the lawmaking power of the state, to do so."

By its very nature, and certainly by its express terms, the Texas primary law provides for the exclusion from participation in party primaries of persons granted the constitutional right of suffrage, if the constitutional grant extends to primary suffrage. The definition in our statutes of a "primary election" excludes therefrom all save "the members of an organized political party." The test prescribed and authorized, as to which the Constitution is silent, operates still more restrictively. Articles 3085, 3096, 3093, Vernon's Sayles' Texas Civil Statutes.

We think it fallacious to argue that our primary election laws regulate, but do not restrict, the right of suffrage. It is true they regulate, but the first and essential step in the regulation is to restrict.

Most of the states, as above noted, have primary election systems, established under constitutional provisions similar to ours. Hence, if our primary system is affected by constitutional infirmity, so would be most of the primary systems of our sister states.

[1] No matter how far-reaching and disastrous would be the consequences of declaring primary suffrage within the scope of our constitutional provision, we would not decline to make the declaration if such was believed to be the true intent of the language of the Constitution. It is a proper inquiry, however, in ascertaining whether a certain interpretation should be given to the language of the Constitution, to consider whether its framers and the voters by whom it was adopted intended the consequences which must follow such interpretation. Scott v. Sandford, 19 How. 426, 15 L. Ed. 691; Maxwell v. Dow, 176 U. S. 602;[1] Ass'n v. New York, 152 N. Y. 257, 46 N. E. 499, 37 L. R. A. 792.

In Kelso v. Cook, 184 Ind. 180, 191, 110 N. E. 990, 993 (Ann. Cas. 1918E, 68), it was contended that a primary election came within the purview of section 2 of article 2, of the Constitution of Indiana, which reads:

"In all elections not otherwise provided for by this Constitution every male citizen of the United States, of the age of 21 years * * * who shall have resided * * * in the township sixty days, and in * * * the precinct thirty days, immediately preceding such election * * * shall be entitled to vote in the * * * precinct where he may reside, if he shall have been duly registered. * * *"

218 S.W.—31

In rejecting the contention, the Supreme Court of Indiana said:

"The character of an act is often best determined by viewing it from the standpoint of its results. The practical result of holding that section 2 of article 2, supra, covers primary elections, is their destruction, whether voluntarily held by groups of electors called political parties, or involuntarily held under statutory mandate. We do not believe that the people, in adopting the constitutional provision, had any such result in mind."

Likewise, we have no doubt that nothing was further from the minds of any one having a part in framing the suffrage provisions of our Constitutions or further from the minds of the voters by whom same were adopted than to prevent nominations by means of party primaries.

Indeed, in the light of the history of party nominations by conventions and by primaries in this state, the conclusion seems inevitable that the people in voting on section 2 of article 6 of the Constitution of 1876, and on the amendment adopted in 1902, could not have contemplated or intended for the original section or amendment to have any relation whatever to party primaries. The idea of subjecting parties to restraint in the matter of selecting nominees and of declaring and accomplishing party aims is one which arose after the words were put into the Constitution, which are now claimed to govern qualifications of participants in primaries.

It seems to us that due consideration for the opinions of the appellate courts of other states, construing similar constitutional provisions, relating to elections and to electors, must at least make doubtful whether the language of section 2 of our article 6 could be properly held to refer to primary elections and to those participating therein. Our obligation to carefully consider such opinions, in determining constitutional questions, is plainly announced by this court in the opinion of Chief Justice Hemphill in the early case of De Cordova v. Galveston, 4 Tex. 476.

It was said by the Supreme Court of West Virginia in the case of Baer v. Gore, 79 W. Va. 58, 90 S. E. 533, L. R. A. 1917B, 728:

"By many text-books and decisions an important distinction is noted between a general and a primary election. They treat a primary election merely as a substitute for a nominating caucus or convention and not as an election within the meaning of that term as used in Constitutions. So treated, it is a mere matter of statutory regulation within a reasonable exercise of the police power of the state, predicated on rights reserved by the people, when not forbidden by the organic law of the municipality. This principle is especially emphasized with reference to the qualifications of electors and tests of party membership prescribed by primary laws."

In State v. Flaherty, 23 N. D. 323, 136 N. W. 81, 41 L. R. A. (N. S.) 132, it is stated:

[1] 20 Sup. Ct. 448, 494, 44 L. Ed. 597.

"Many courts lay down the broad rule that such constitutional provisions are applicable only to general elections, and therefore *do not* apply to primary elections. As illustrative we quote from Riter v. Douglass, 32 Nev. 400, 109 Pac. 444: 'That a primary election of candidates is not an election of officers within the meaning of the constitutional test has been *sustained by an overwhelming weight of authority* in states with similar constitutional provisions to those contained in the Constitution of Nevada'—citing Line v. Election Canvassers (Line v. Waite) 154 Mich. 329, 18 L. R. A. (N. S.) 412, 117 N. W. 730, 16 Ann. Cas. 248; Montgomery v. Chelf, 118 Ky. 766, 82 S. W. 388; State ex rel. Gulden v. Johnson, 87 Minn. 222, 91 N. W. 608, 840; State ex rel. Webber v. Felton, 77 Ohio St. 554–578, 84 N. E. 85, 12 Ann. Cas. 65; Dooley v. Jackson, 104 Mo. App. 21, 78 S. W. 333."

There is another line of authorities which excludes from the purview of such constitutional provisions as ours all elections provided for by statute only, and not by the Constitution. Scown v. Czarnecki, 264 Ill. 305, 106 N. E. 276, L. R. A. 1915B, 253, Ann. Cas. 1915A, 772; Riter v. Douglass, 32 Nev. 400, 109 Pac. 444; State v. Nichols, 50 Wash. 508, 97 Pac. 728; Schostag v. Cator, 151 Cal. 600, 91 Pac. 502; State v. Flaherty, 23 N. D. 313, 136 N. W. 76, 41 L. R. A. (N. S.) 132; Hanna v. Young, 84 Md. 179, 35 Atl. 674, 34 L. R. A. 55, 57 Am. St. Rep. 396; Coggeshall v. Des Moines, 138 Iowa, 730, 117 N. W. 309, 128 Am. St. Rep. 229; Buckner v. Gordon, 81 Ky. 665; State ex rel. v. Dillon, 32 Fla. 545, 14 South. 383, 22 L. R. A. 124; State v. Johnson, 87 Minn. 223, 91 N. W. 604, 841.

See, also, Baer v. Gore, 79 W. Va. 50, 90 S. E. 533, L. R. A. 1917B, 728; Montgomery v. Chelf, 118 Ky. 766, 82 S. W. 388; Wheeler v. Brady, 15 Kan. 26; State v. Monahan, 72 Kan. 492, 84 Pac. 130, 115 Am. St. Rep. 224, 7 Ann. Cas. 661; Harris v. Burr, 32 Or. 348, 52 Pac. 17, 39 L. R. A. 768; State v. Board of Elections, 9 Ohio Cir. Ct. R. 34; State v. Felton, 77 Ohio St. 554, 84 N. E. 85, 12 Ann. Cas. 65; Re Carragher, 149 Iowa, 225, 128 N. W. 352, 31 L. R. A. (N. S.) 322, Ann. Cas. 1912C, 972; Seaman v. Baughman, 82 Iowa, 216, 47 N. W. 1091, 11 L. R. A. 354; Mayor v. Shattuck, 19 Colo. 104, 34 Pac. 947, 41 Am. St. Rep. 208; People v. English, 139 Ill. 622, 29 N. E. 678, 15 L. R. A. 131; Plummer v. Yost, 144 Ill. 68, 33 N. E. 191, 19 L. R. A. 110; Ackerman v. Haenck, 147 Ill. 514, 35 N. E. 381; Landis v. Ashworth, 57 N. J. Law, 509, 31 Atl. 1017; State v. Board, 57 N. J. Law, 605, 31 Atl. 1033; Opinion of Justices, 115 Mass. 602; Olive v. School Dist., 86 Neb. 135, 125 N. W. 141, 27 L. R. A. (N. S.) 522; State v. Cones, 15 Neb. 444, 19 N. W. 682; Belles v. Burr, 76 Mich. 1, 43 N. W. 24; Menton v. Cook, 147 Mich. 540, 111 N. W. 94; In re Gage, 141 N. Y. 112, 35 N. E. 1094, 25 L. R. A. 781; In re Inspectors of Elections (Sup.) 25 N. Y. Supp. 1063; Spitzer v. Fulton, 172 N. Y. 285, 64 N. E. 957, 92 Am. St. Rep. 736; Leflore County v. State, 70 Miss. 769, 12 South. 904.

A number of the above cases announce conclusions similar to Scown v. Czarnecki, 264 Ill. 305, 106 N. E. 276, L. R. A. 1915B, 247, Ann. Cas. 1915A, 776, which involved the validity of an Illinois statute of 1913, known as the Woman's Suffrage Act, and which, though it did not mention party primaries, granted to women the right of suffrage as to certain officers and as to certain other subjects therein mentioned, some of which were, and some of which were not, covered by provisions of the Constitution of Illinois. The line of cleavage was very clearly drawn and strictly followed, as of determinative force, by the Supreme Court of that state, in an opinion holding said statute in part invalid and in part valid. In that opinion, after reviewing previous decisions of the Illinois Supreme Court, it is said:

"By these decisions the rule is settled that section 1 of article 7 of the Constitution refers only to elections provided for by that instrument. The qualifications of voters at such elections are fixed by the Constitution and the Legislature cannot change them. Other elections, however, provided for only by statute and not by the Constitution, are wholly within the control of the Legislature."

The Court of Civil Appeals at Austin determined in a carefully considered opinion, in the case of Hamilton v. Davis, 217 S. W. 431, in which all the judges concurred, that the legislative act mentioned in the certified question was not violative of the Constitution.

If the decisions referred to, and others in line with them, should not be accepted as conclusive in so far as they bear on the precise question under consideration, as we are inclined to regard them, it seems to us that they must at least raise grave doubt as to whether our constitutional provision and similar clauses in other Constitutions were meant to prescribe the qualifications of participants in party primaries.

[2] Nothing is plainer than our duty when such doubt exists. Judge Brown was very particular in laying down the principle which has ever guided and must ever guide this court, under such conditions, when he said, in Brown v. Galveston, 97 Tex. 9, 75 S. W. 492:

"If there be doubt as to the validity of the law, it is due to the co-ordinate branch of the government that its action should be upheld and its decision accepted by the judicial department. In his work on Constitutional Limitations (page 218), Mr. Cooley says: 'The question whether a law be void for its repugnancy to the Constitution is at all times a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The court, when impelled by duty to render such a judgment, would be un-

worthy of its station could it be unmindful of the solemn obligation which that station imposes; but it is not on slight implication and vague conjecture that the Legislature is to be pronounced to have transcended its powers, and its acts to be considered void. The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other.'"

Judge Brown and the court felt that the importance of this enunciation justified its repetition, and later in the same opinion it is declared:

"If there was doubt in our minds our conclusion must be as expressed in the following quotation: 'But if I could rest my opinion in favor of the constitutionality of the law on which the question arises, on no other ground than this doubt so felt and acknowledged, that alone would, in my estimation, be a satisfactory vindication of it. It is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body by which any law is passed, to presume in favor of its validity, until its violation of the Constitution is proved beyond all reasonable doubt.'" Brown v. Galveston, 97 Tex. 12, 75 S. W. 493.

Principal reliance is placed, in attacking the statute, on the decisions in Ashford v. Goodwin, 103 Tex. 491, 131 S. W. 535, Ann. Cas. 1913A, 699, Anderson v. Ashe, 62 Tex. Civ. App. 262, 130 S. W. 1044, and Lane v. McLemore (Civ. App.) 169 S. W. 1073. The last-named two cases follow the decision in Ashford v. Goodwin, where it was held that the amendment to the Constitution conferring original jurisdiction on the district courts in cases of contested elections authorized the district courts to hear and determine contests of primary elections.

That decision can be rightly understood by bearing in mind its underlying principle, announced by the court, per Judge Brown, immediately after the statement of the case in these words:

"When the Legislature passed that act, they must, in the discharge of their duty, have determined that the power to so enact was conferred upon that body by the language we have quoted above from section 8 of article 5 of the Constitution as amended. The Legislature having determined that the power was granted to that body to pass the law, this court must sustain it unless its invalidity be apparent beyond a reasonable doubt."

Here, the Legislature necessarily determined that section 2 of article 6 left them free to fix the qualifications of participants in primaries, and, since we cannot say that the legislative determination was wrong beyond a reasonable doubt, we must sustain it. If we did otherwise, we would fail to apply the principle on which the decision in Ashford v. Goodwin is based.

[3] We do not regard the proceedings of the constitutional convention relative to woman suffrage as bearing on the right of women to participate in primaries under an act of the Legislature. Such proceedings related only to the participation of women in governmental elections, and not to their participation in the acts of any nongovernmental, voluntary groups of citizens, clothed with no ultimate power to fill constitutional or other offices, to amend Constitutions, or to impose tax burdens.

We cannot agree that the act of the Legislature infringes on any right of qualified electors under section 2 of article 6. While it is true that no one actuated by conscientious and honorable motives will fail to support the nominees of a primary in which he or she participates, the fact remains that the primary law compels no one not satisfied with the statutory and party regulations to enter a primary. Even after participating in the primary, the qualified elector is legally free to vote as he chooses in the general election, no matter how contrary that vote may be to good conscience or to moral obligation. It would be most unreasonable to say that something amounts to an actual infringement of a person's rights, when the asserted infringement may be entirely avoided at the option of such person.

There being no constitutional prohibition, it follows that the Legislature was free to extend the privilege of participation in party primaries and conventions to women possessing the qualifications, save sex, of electors under our Constitution and laws, as is recognized in the above-quoted portion of the opinion in Solon v. State.

"By section 1 of article 3, the Constitution declares 'the legislative power of this state shall be vested in a Senate and House of Representatives, which together shall be styled "the Legislature of the State of Texas."' 'The legislative power of this state means all the power of the people which may properly be exercised in the formation of laws against which there is no inhibition expressed or implied in the fundamental law.'" Brown v. Galveston, 97 Tex. 15, 75 S. W. 495.

We answer, "No," to the certified question, having determined that there is no conflict between the legislative act and section 2 of article 6 of the Constitution.

PHILLIPS, C. J. (dissenting). This decision in my opinion subverts the Constitution of this State and makes of it a vain and useless document.

If the plain, simple and unmistakable language of Section 2 of Article 6 may be evaded with the ease and facility that marks this decision, there is no provision in the instrument that is stable in its meaning and secure in its foundation. By the sanction of this holding the settled terms of other provisions are made subject to the same ingenuity of construction. Instead of standing

there as certain terms, they are made equivocal terms. The constitution of the people, meant by them to be the charter—the constant charter—of their rights and liberties; the inviolable limitation upon the powers of government confided by them in trust to the agencies of their creation; the unchanging, immutable organic law of the Commonwealth until amended by their hands; becomes but a fickle and variable pronouncement, having no longer the force of their sovereign command and affording no longer the protection of their sovereign will.

I protest against any holding that impoverishes this State by reducing its Constitution to that poor degree. I object to construing away of any part of that instrument. Therefore I enter and record my emphatic dissent from this decision.

The decision affirms:

1. That although the Constitution in Section 2 of Art. 6 by express terms makes "any election" in Texas the subject of its provision and prescribes what shall be the qualifications of voters in Texas at "any election"; that although party primaries are by the laws of the State made public "elections," and are "elections" in the common, everyday meaning of the word, and so known and recognized to be by every body; and although those elections are so vital to the people of the State as ever since their establishment by law to have been the means of naming all the public elective officers of the State, from the highest to the lowest; yet, this section of the State's supreme law does not comprehend them and has no application whatever to them.

I maintain that the language of this section is so simple and plain as not to admit of construction or refinement by courts, and that it means, steadily and unfailingly, the qualifications it prescribes shall be possessed by all voters at all public elections in the State which the Legislature has the power to establish and which it may provide by law.

2. That it is within the authority of the Legislature to say what persons or classes of persons shall exercise the rights and privileges of members of the political parties of this State, and thus, at its will, constitute them members of those parties.

I say the Legislature has no such power. If it has, there are no individual rights, no personal liberties, in this State that are not held at legislative sufferance and are not subordinate to legislative control.

This decision will have a consequence far beyond this immediate case. I doubt if its authors realize the effect of it. I doubt if they have estimated its meaning, or foreseen its result. It unsettles the basis upon which until now the inherent, natural rights of the citizens of Texas have rested. It denies the character of those rights as something free and exempt from governmental interference. It places them at the open and unrestrained disposal of governmental power.

The two propositions stated above, which the decision inevitably declares shall hereafter be the law as announced by this court, I wish to briefly discuss. Before doing so it may be well to re-state some common things which ought not to require re-statement, but only in the clear and sustaining light of whose self-evident truth may such questions as these be truly understood and rightly solved.

The people of the State are the source of all the governmental authority of the State. They and they only created the government of the State and gave its legislative, executive and judicial departments their several powers. They did this by means of the Constitution. It is their handiwork, their law. That is why it is the paramount law, the final law. It is equally binding upon the government of the State in all of its branches, as upon every individual in the State. No power of the government in either of its branches may be exercised except in faithful obedience to it. The authority of the people is original. The authority of the government is only derivative. When the government exercises its powers in observance of the Constitution, its action has all the force of the original sovereignty of the people because lawful use is made of that part of their sovereignty which they have confided to it. When in the exercise of its powers it disregards the limitations, express or implied, placed by the people through the Constitution upon its authority, it makes unlawful use of that delegated sovereignty and its action is void.

The rights of the people do not owe their origin to the Constitution, nor to the government created by means of the Constitution. They existed before either was made. The great office of the Constitution of the State is to preserve them. That is why in its essential character it is a limitation, a restraint, upon the power entrusted to the government.

What in the creation of the State government the people deemed inherent rights, natural rights, rights to be freely and independently exercised in the absolute right of themselves as individuals, beyond any meddling, any hindrance, and any control by the government, they excepted out of the powers of the government. They remain their individual rights. The people have retained their control solely unto themselves, because unwilling to surrender them into any other hands. They express the individual freedom of the citizen. They comprise his personal liberties. They are his birth-right. They alone make him a freeman and invest him with the proud dignity of that incomparable character. The government is without any

power to abate them, to impair them, to control them or regulate them. They are free. And whenever the government in any degree infringes them, in the language of the Bill of Rights it "transgresses its powers."

These rights are many. It is not necessary to enumerate them here. Among them, and one of the chief among them, is the right of the citizen to associate himself with other citizens in a political party for the advancement of his political beliefs and the influential exercise of his political rights.

As to how a political party shall elect its nominees may be regulated by the government. This authority exists because of the essential and known importance of those elections and its being a proper concern of the government that they be fairly held. The government therefore has the power to say that such an election shall be by means of a party primary, and to provide proper laws for the conduct of the primary. It was so declared in my opinion in Waples v. Marrast, 108 Tex. 5, 184 S. W. 180, L. R. A. 1917A, 253.

But the power to declare who shall be members of a political party, is another matter. If the government has that power, it has the equal power to say what shall be the beliefs, the principles, of the party. The principles of a party will always be determined by who are its members. If the government may do the one, it may do the other. If it may do both, or either, what power has the party? Its freedom of action is gone, and with it the character of its organization.

The words of a constitution are to be expounded, rather than construed. As found in our Constitution they are plain Anglo-Saxon words, hardy words, and therefore simple words—the words of the common speech of the people. They were written for the people to easily understand in their voting upon the adoption of the instrument. There is nothing abstruse about them, nothing occult, hidden or mystical. They were not supposed to present enigmas to the people in adopting them nor to courts in enforcing them. They are not to be dissected with the niceties of the acute mind that is able to "sever and divide a hair 'twixt north and northwest side." They are not to be wrested from their plain meaning. They are neither to be enlarged nor reduced by courts. They are only to be expounded in their ordinary and common sense—not the sense that the learned man, the metaphysician, or the casuist might attach to them—but as the average man would understand them. Judge Story said this on the subject:

"Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss."

If what this eminent author warned against be avoided, and the plain, ordinary meaning of the term "elections" as used in Section 2 of Article 6 be given it, it includes any public election established by law, and therefore the primary elections provided by the statutes of the State.

That section in prescribing the qualifications of voters in "elections" and in "any election" to be held in this State, does not attempt to particularize any kind of "election." It does not name "general elections." The term "general elections" is not found in any of the provisions of the Constitution dealing with elections. Only in Section 27 of Article 3 does even the word "general" appear. That section reads:

"Elections for Senators and Representatives shall be general throughout the State, and shall be regulated by law."

Neither does Section 2 of Art. 6 designate "bond elections," or "stock law" elections. Yet no one will deny that voters in those elections must have the qualifications declared in Section 2 of Article 6. Why apply the Constitution to them, and not to primary elections? What in their nature—their nature alone, and not reasons of convenience, should furnish the test—is peculiar to primary elections that differentiates them from other public elections and exempts them from the operation of the Constitution?

If an election to determine whether pigs may run at large in a justice precinct at which only 100 men may vote, is an election within the meaning of the Constitution, by what process of reasoning is it to be held that an election at which 400,000 citizens customarily vote and whose effect is to name the incumbents of all the elective offices of the people, is wholly ungoverned by the Constitution? It is a process that does not commend itself to me, and I reject it.

It begs the question to say that the "elections" referred to in this section mean only the elections provided in other parts of the Constitution. The Constitution itself nowhere says that. What warrant has a court in saying it? How does it know that that is true? What liberty has it to read any such provision into the Constitution? Judge Campbell, one of the great judges of the land, who with Judge Cooley was a notable figure upon the Supreme Court of Michigan, exposed the fallacy of this contention in his dissenting opinion in Belles v. Burr, 76 Mich. 1, 43 N. W. 32. The holding in support of it in the Scown Case, 264 Ill. 305, 106 N. E.

276, L. R. A. 1915B, 247, Ann. Cas. 1915A, 772, cited in the prevailing opinion, was only by a divided court. No sound reason can be given for making a distinction between the qualifications of voters in an election provided by a constitution and one lawfully provided by statute. The latter may be of as great importance as the former. No ground for the distinction is to be found in our Constitution. When in Section 2 of Article 6 it fixes the qualifications of voters in "any election," it means all public elections provided by law. If it doesn't mean this, it either means nothing or whatever a court simply according to its own notion may declare.

By express decision of this court, the attempt to exclude primary elections from the meaning of the term "elections" as used in Amended Section 8 of Article 5 wherein the District Courts are given jurisdiction of "contested elections," was repudiated. Ashford v. Goodwin, 103 Tex. 491, 131 S. W. 535, Ann. Cas. 1913A, 699.

Such jurisdiction was first conferred upon the District Courts by that Amendment to the Constitution, adopted in 1891. There was then no primary election law. The first law of that character in this State was enacted in 1903. Public primary elections, therefore, were not known to any existing law when the Amendment of Section 8, Article 5, was adopted.

It was insisted in that case, in the same way that it has been insisted here and held here, that the word "elections" used in Amended Section 8 of Article 5 did not mean "primary elections."

This court held that it did.

In sustaining the validity of a statute which gave to the District Courts the jurisdiction to review the action of County Executive Committees on party primary elections—which would have been invalid unless the term "elections" as used in Amended Section 8 of Article 5 included primary elections, the court held that the term "elections" as used in the Constitution was broad enough to include primary elections, made the subject of the legislative act, *"there being nothing in the Constitution which limits the meaning of the words used."* Neither is there anything in the Constitution which limits the meaning of the term "election" as used in Section 2 of Article 6.

If there, as declared by this court, the term "elections" as used in Section 8 of Article 5 was broad enough to warrant the Legislature's giving it the meaning of "primary elections," how can it be held here— in determining the sense of a constitution, an instrument whose terms in their very nature are broad and general, always, and therefore always to be liberally interpreted —that the same term when used in another provision of the same Constitution is so narrow as to exclude that meaning? It is a strange doctrine for any court, and especially this court, to announce.

Is the same simple word in a constitution to be thus construed? Is it to be held as meaning one thing at one place in the Constitution and a wholly different thing at another? Is it to be broadly interpreted as found in one provision and narrowly interpreted as found in another provision? If so, why? If so, has it any certainty of meaning anywhere in the instrument? This court has held that in a statute the same term, without amplifying or qualifying phrase, will be presumed to have been used in the same sense. Texas Bank & Trust Co. v. Smith, 108 Tex. 265, 192 S. W. 533, 2 A. L. R. 771. This is more true of the words of a constitution, particularly words of the most familiar character, as the word "election" is.

If a decision of this court, rendered by judges among the ablest that have ever composed it, has any authoritative force with the court itself, Ashford v. Goodwin settles this question and settles it beyond any doubt.

Anderson v. Ashe, 62 Tex. Civ. App. 262, 130 S. W. 1044, by the Court of Civil Appeals for the First District, is equally conclusive.

If authorities beyond those of this court are to be consulted, as clear and definite a determination of the question by a strong and learned court as can be found, is Leonard v. Commonwealth, by the Supreme Court of Pennsylvania, 112 Pa. 607, 4 Atl. 220. By the Constitution of Pennsylvania it was provided that any one while a candidate for office guilty of bribery, fraud or wilful violation of "any election law," should be forever disqualified from holding any office of trust or profit in the Commonwealth. Leonard, who had been elected to such an office, and had entered upon its duties, was ousted from the office by a quo warranto proceeding under the authority of this provision of the Constitution. The election law he had violated was one relating to primary elections. On the appeal, it was contended that the phrase "any election law" used in the Constitution had no reference to primary elections. Holding that a constitution provides for the future as well as the present, and that the phrase in question meant any election law in existence when the Constitution was adopted, *"or thereafter to be passed by the Legislature, which that body had a right to pass,"* the court further said:

"What is an election law? Here, again, we must bring to our aid the common and popular use of words. Our laws are intended for the people, who are presumed to read and understand them. They are not like the edicts of the Roman Emperor Caligula, which Dio Cassino says were written in very small characters, and hung up so high that the people could not read them. When laws are made by a popular government, that is to say, 'a government of the people, by the people, and for the people,' we may safely assume that words in a statute

or a constitution, are used in a sense in which the people who made the statute or constitution understood them. So that when the people inserted in their constitution the words 'any election law,' it is fair to assume that they meant any law relating to elections."

Is it any less fair to assume that the people of Texas in adopting Section 2 of Article 6 meant that the qualifications of voters in "any election" there prescribed should be the qualifications of all voters in all public elections then known to the laws of the State or that the Legislature might thereafter lawfully establish?

In People v. Strassheim, 240 Ill. 279, 88 N. E. 821, 22 L. R. A. (N. S.) 1135, it was held that a primary election law was within the meaning of the Constitution of that State prescribing the qualifications of voters, and that to be valid a primary election law must sustain those qualifications and not curtail, subvert or add to them.

Other cases to like effect—many might be cited, are People ex rel. Breckon v. Board of Election Com'rs, 221 Ill. 9, 77 N. E. 321, 5 Ann. Cas. 562; Rouse v. Thompson, 228 Ill. 522, 81 N. E. 1109; Spier v. Baker, 120 Cal. 370, 52 Pac. 659, 41 L. R. A. 196.

In Cooley's Constitutional Limitations, p. 753, it is declared:

"Wherever the constitution has prescribed the qualifications of electors, they cannot be changed or added to by the legislature, or otherwise than by an amendment of the constitution."

In Black on Constitutional Law, p. 648, it is said:

"Where the constitution of a state (as is usually the case) fixes the qualifications' of those who are to enjoy the right of suffrage, it is the intention that the standards so set up shall remain unalterable until the popular will changes to such an extent as to involve an alteration of the organic law. In this case it is not within the constitutional power of the state legislature to alter, modify or dispense with the qualifications determined by the constitution. It is not lawful to enact statutes which would either exclude persons admitted by the constitution, or admit persons whom the constitution would shut out. No new or different qualifications can be prescribed, nor can any of those named by the constitution be abrogated."

If Section 2 of Article 6 does not apply to voters at primary elections, neither does Section 1 of that Article. That section names certain classes of persons who "shall not be allowed to vote in this State." They are minors, idiots and lunatics, paupers, soldiers, marines and seamen employed in the service of the Army or Navy of the United States, and subject to such exceptions as the Legislature may make, all persons convicted of any felony. Under this decision the positive prohibition of this section is of no force as to voters in primary elections. The effect of the decision is to affirm that the Legislature has the power to say if it chooses that in those elections children may vote, as well as convicted felons.

The same is true with respect to Section 5. To avoid interference with the exercise of the right of suffrage, it is there provided that in all cases, except treason, felony, or breach of the peace, voters shall be privileged from arrest during their attendance at elections and in going to and returning from them. Under this decision no voter at a primary election may hereafter invoke the protection of that constitutional provision.

I hold that the right of the citizen to choose candidates for public offices is as valuable as the right to vote for them after they are chosen. In the nature of the right, there is no difference. The only difference is the occasion for its exercise. In this State, in actual result the primary election is the decisive election. No court can blind its eyes to this universally known fact. Nor can it escape the knowledge that holding the Constitution to be of no effect as to the qualifications of voters in primary elections is, in its real and actual substance, but to annul it as it relates to the qualifications of voters in the general election.

Of what use is it to enforce the Constitution only in general elections, when, in fact, the primary elections are the decisive elections in this State in the choosing of public officers.

It will not be denied—it cannot be—that the framers of the Constitution and the people of the State in its adoption were deeply concerned that only those persons having the qualifications named in the Constitution should vote, or be entitled to vote, in the election, regardless of its name or other character, at which the elective officers of the State were to be determined. That much must be admitted. They must be credited with knowing that save in an election involving change in the State's organic law, that election would be the most vital in the affairs of the State. It is conceded that only those persons qualified according to the Constitution may vote in the general election. With the Constitution looking to the future, and speaking for the future, and its mandates imperative throughout all the years of its duration; and with it an incontrovertible fact that the framers of the Constitution and the people in its adoption meant that in the selection of the elective officers of the State only persons should be privileged to vote who were qualified as by the Constitution required; what right, I ask, has this court to say, as a matter of law, that it was not intended that the Constitution should control the qualifications of voters in any election provided by law having conclusive force or vital relation in the choosing of those officers,

which any future period might develop? The primary election provided by our laws is admittedly an election of that character and consequence. The language of the Constitution is plainly broad enough to include it, whatever may be the argument as to an intention to include it. Is it not fair and reasonable, therefore, to assume that the Constitution was meant to include such an election and to govern it? When the broad purpose of the Constitution in Sections 1 and 2 of Article 6 is looked to, in my opinion no other conclusion is possible.

If the Legislature is unrestrained by the Constitution in declaring what shall be the qualifications of voters in primary elections, it may not only add to the classes of persons entitled to participate in the naming of party candidates, but it may equally deprive of that right those classes now recognized as entitled to exercise it. Under this decision it would be within its authority to say that the citizen privileged under the Constitution to vote in the general election, should not be entitled to vote in the primary election of his party, notwithstanding his loyalty to it, long and honorable service in its promotion, and devoted concern for its success. If this broad and general power be conceded in the one instance, it cannot be denied in the other. The legislative power to declare what persons are qualified to enter primary elections is either controlled by Section 2 of Article 6, or else it is wholly exempt from the operation of that section. The decision affirms that the Legislature's authority is unaffected by it. If it is, what constitutional safeguard protects the now qualified voter in a general election in his right to vote in the primary of his party? According to the view of the majority of this court if that right is ever threatened, he must look elsewhere than to the suffrage article of the Constitution. I believe the office of that article is to secure him in his right, and that it is an absolute protection of his right.

Who can say that it may not be threatened? Who can foretell the future? High-minded men to its honor and credit now fill the Legislature, but there was a time in our history when aliens held those seats of power and the State was under the yoke of their ruthless rule. It is in such periods as the days of Reconstruction that the value of a Constitution is most revealed, and it is against such periods that its provisions should not be rendered infirm.

It is not merely the privilege of a member of a political party to aid in the selection of its nominees; according to well known party practice it is his duty to help elect them by his vote. This decision means that the Legislature may say that women shall have the right to help decide in the choice of a party candidate, though they are powerless to vote for the candidate in the general election.

For the purpose of naming the party nominees, in other words, the Legislature is held to have the power to declare that they shall be admitted to the full exercise of the rights of members of the party, but when it comes to electing those nominees by votes—the way they must be elected, if at all—the responsibility is cast wholly upon the members qualified under the Constitution to vote in the general election, at which women, it is admitted, cannot vote. This is but to say that the statutory electors, if in sufficient numbers and of similar view, may determine the nominees of the party, but the constitutional electors shall have the burden of electing them. I deny the Legislature has the power to declare in so vital a matter as the selection of the nominees of a political party, as having the full rights of members in the party, a class of persons, who are by the Constitution disqualified from performing what in its nature is among the most important of party obligations.

It is idle to say that the party may not object to the results of such a law. This case deals with the question of the Legislature's power. As it is here claimed for the appellant the validity of the power depends, not upon whether the political parties affected may consent or object to the consequences of its exercise, but upon whether the Legislature may enforce it over objection.

The contention that the provisions of the Constitution as to the qualifications of voters are not capable of practicable application to voters in primary elections, and hence are not to be presumed as intended to refer to them, is in my opinion of no force. Wherein they are incapable of such application is not apparent. They were expressly made applicable to all voters in primary elections by one of the early acts of the Legislature on the subject, and they remained so until the passage of the act which is here involved—a considerable number of years. This is the only act in the history of the State where in any kind of an election prescribed by law, primary elections or other elections, the Legislature has declared that the qualifications of voters should be other than those named in the Constitution.

Waples v. Marrast, 108 Tex. 5, 184 S. W. 180, L. R. A. 1917A, 253, gives no support to the validity of this act and cannot be made authority for a holding which sustains it. The question there was not as to whether primary elections of political parties when prescribed by law were public elections in the sense of the Constitution, but whether their purpose was a public purpose for the furtherance of which the tax funds of the counties of the State might be expended. It was held that the payment of the expenses of holding such elections for the benefit of political parties was not for a public purpose; for which only, under the Constitution,

(218 S.W.)

the funds of the public treasury can be rightfully used. But there is nothing in the opinion which indicates that such elections are not to be treated as public elections. It expressly recognized that they are public elections, for it affirmed the right of the Legislature to require that they be held. If they are not public elections in the true sense, it is difficult to perceive upon what theory the Legislature has any right to control them. A public instrumentality may be capable of being used both for public purposes and private purposes, but its use for the latter would not change its identity or essential character.

I have not had the opportunity to review the prevailing opinion or the authorities it cites. Through no fault of its author, it reached my hands only the day before the rendition of this decision. All of the cases cited are from other jurisdictions, except Hamilton v. Davis recently decided by the Court of Civil Appeals for the Third District. If they hold that the terms "election" and "any election" used as are these terms in our Constitution, do not refer to primary elections prescribed by public law, they are in necessary conflict with Ashford v. Goodwin decided by this court, with decisions of other courts of ability, and in my opinion not sustained by reason and common sense. The Constitution, itself, is the authority which should determine this case. It is sufficient for the purpose, and in my judgment does determine it.

I have proper deference for an act of the Legislature and have no disposition to lightly set aside what it enacts as law. Any doubt as to the validity of its legislation is to be resolved in its favor. But to my mind the Constitution plainly condemns this act and I believe this court should so declare.

⬥For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes